**People of the State of Illinois, Plaintiff-Appellee, v. Eddie Chambers, Defendant-Appellant.**

Gen. No. 52,102.

First District, First Division.

June 23, 1969.

Gerald W. Getty, Public Defender of Cook County, of Chicago (Ronald P. Katz and James J. Doherty, Assistant Public Defenders, of counsel), for appellant.

Edward V. Hanrahan, State's Attorney of Cook County, of Chicago (Elmer C. Kissane and Gerald T. Rohrer, Assistant State's Attorneys, of counsel), for appellee.

MR. JUSTICE MURPHY delivered the opinion of the court.

In a bench trial and under consolidated indictments defendant was found guilty of murder and of robbery. He received two concurrent sentences to the penitentiary of 50 to 75 years. On appeal he contends (1) that his in-court identification "was tainted by a prior suggestive police lineup"; (2) that he was not proved guilty beyond a reasonable doubt; and (3) that the sentences imposed were excessive.

On January 24, 1966, at about 2:00 p. m., a man with a knife entered the store of the Auburn Park Cleaners at 75 East 79th Street, where Mrs. Della Fields was alone on duty as a clerk. On his demand, Mrs. Fields gave him $20 from the cash register, and then they both went to the rear of the premises looking for a "second bank" kept in a small pasteboard pin box. While they were in the rear, Henry Cullors, a 74-year-old customer, came into the store for his shirts, which defendant directed Mrs. Fields to give to him. After some colloquy, defendant stabbed Cullors twice on the face, and Cullors died while still in the store.

The testimony of Mrs. Fields as to the robbery included: The man was "trying to get Mr. Cullors behind the counter and Mr. Cullors wouldn't come behind the counter

348

so the man just swung and hit him with the knife, cut him with the knife. I saw the knife in the hand of this man. Mr. Cullors was cut on the left side of his face or head. After this Mr. Cullors told him, 'Look how I am bleeding. Let her call a doctor.' And he told him, he said, 'If you don't get behind the counter and lie down I will stand up here and let you bleed to death.' Mr. Cullors still wouldn't lie down and I told Mr. Cullors, 'Lie down and I will get a doctor for you.' He then laid down. The man went to the door and came back. He had placed the money box I had given him on the counter while he was hitting Mr. Cullors. He then started toward the door and came back and took his money. He took the money out of the box and threw the box on the counter. Mr. Cullors was still lying there at this time."

After defendant left, Mrs. Fields called the police, who arrived in about five minutes. Mrs. Fields described the robber to the police as a male Negro, weighing about 160 pounds, and about 25 to 30 years old; he had a pockmarked face, and he was wearing a three-quarter length black leather coat and a black hat. Later that day she modified her description of the assailant by stating that he had a large bump on his cheek and was wearing a black jersey knit shirt under the coat.

On February 1, 1966, Mrs. Fields received a telephone call from the police that they had "caught a man that might be the man." Later she was taken to the 21st District Station for a showup, where she identified defendant as the assailant.

Police Officer James Lewis, a laboratory technician for the Chicago Police, went to the cleaning store on the day of the robbery and took pictures of fingerprints found on the pin box and transported the evidence to the Police Bureau of Identification.

Officer Joseph Mortimer, a fingerprint expert with the Chicago Police for over 20 years, testified he examined

the fingerprint card of the defendant made at the time of his arrest and the photographs of the fingerprints on the pin box. A comparison revealed that the prints off the box matched the right thumb and left index finger of the defendant. The officer further stated that it was normal identification procedure to make seven to twelve points of comparison for positive identification, and in the instant case there were nineteen points of comparison between the defendant's left index finger and one of the prints lifted from the pin box. In the officer's expert opinion the prints "were made by one and the same person."

The defendant took the stand in his own defense. He had no recollection of the day in question and denied the robbery and the killing of Mr. Cullors.

Defendant's witness, Mrs. Delores White, testified that she was the office manager of the Gluckman Clinic at 2407 West Warren Avenue in Chicago, and that defendant was in the waiting room of the clinic at the time the cleaning shop was robbed. A "medical history" card was presented, which showed the dates 1-24-66 and 1-26-66 as dates on which the defendant was in the clinic. The witness said she personally made the entry on the respective dates.

Officer Alford testified on rebuttal that he had seen the card on February 1, 1966, at the Gluckman Clinic, and the date 1-24-66 did not appear on the card.

Initially considered is defendant's contention that the lineup was grossly unfair and substantially tainted the subsequent in-court identification by Mrs. Fields.

Mrs. Fields testified that the lineup of February 1, 1966, consisted of five Negro men with hats on and of different heights. She was asked if she noticed whether the person who committed this offense had a goatee, beard, mustache or was clean-shaven. Her answer was that she did not know. She further testified that at the lineup she did not notice whether the defendant had

350

a goatee or a mustache; also, she did not observe whether any of the other men in the lineup had a pockmarked face or bumps on their face. Mrs. Fields said the robber was of dark complexion and in the lineup some of the men were darker than others. She stated that in the lineup she recognized the defendant by the green jacket he was wearing.

Police Officer O'Connell testified that at the time of the lineup defendant was a "Male Negro, six feet tall, 185 pounds, dark complexion, pockmarked face, with a prominent festered pimple on his left cheek, mustache, he had badly decayed or broken teeth in the front, he was wearing a green hat, a light green jacket, a green pullover sport shirt, dark gray trousers and black ankle-type boots."

Defendant notes "that at the time of the robbery and at the time Mrs. Fields identified the defendant in the lineup she was unable to state whether the defendant or the robber had on a beard, mustache or goatee or was clean-shaven. She was, however, able to pick out the defendant who was wearing a mustache at the time. She was unable to describe the defendant's nose nor the presence of his decayed teeth. If it was indeed the defendant she would have no difficulty in describing to the police the presence of a mustache or beard or goatee." Also, defendant contends that a fair lineup would have included another prisoner in the lockup, "Thomas Cotton, whose physical characteristics (the pockmarked face), resembled that of the actual perpetrator of the crime."

Defendant, to show that the lineup was highly suggestive and prejudicial to the defendant, enumerates the following points: (1) The defendant was the only man in the lineup with a mustache; (2) The defendant was the only man in the lineup with a pockmarked face, although the police had another suspect with a pockmarked face in custody; (3) The men in the lineup with the defendant

351

were not all of the same height; (4) The men in the lineup were not of the same complexion; and (5) The police informed the complaining witness prior to the lineup that "they caught a man that might be the man."

Defendant asserts that Stovall v. Denno, 388 US 293 (1967), stated that "where the in-court identification of a defendant resulted from a line-up or show-up conducted in such a manner that it is so grossly unfair it is a denial of defendant's right to due process of law under the Fourteenth Amendment and must be excluded."

The State asserts that the lineup was fundamentally fair and unprejudicial to defendant and states the evidence shows "the line-up was composed of five male Negroes of the same approximate age and physical description. Four of the five were approximately six feet tall and the fifth was approximately five foot eight inches tall. All were dressed similarly. They were all of approximately the same complexion. 'Some were darker than others. There weren't any real light ones.'" Also, the State points out that the record shows one week after the robbery-murder Mrs. Fields immediately and without hesitation picked the defendant out of the lineup and later made a statement in his presence.

In considering defendant's contention that the lineup was unfair and prejudicial to defendant, we note that in Stovall v. Denno the court also stated (p 302):

"However, a claimed violation of due process of law in the conduct of a confrontation depends on the totality of the circumstances surrounding it, and the record in the present case reveals that the showing of Stovall to Mrs. Behrendt in an immediate hospital confrontation was imperative."

██ After an examination of the "totality of the circumstances surrounding" the lineup identification of defendant by Mrs. Fields on February 1, 1966, we conclude

that the composition of the lineup was not fundamentally unfair or prejudicial to the defendant, and defendant was not prejudiced by the manner in which the police notified the complaining witness to appear at the lineup.

Considered next is defendant's contention that the identification of the defendant "was vague, uncertain and cannot sustain a finding of guilt beyond a reasonable doubt," primarily because the State's witness was uncertain as to whether the assailant at the time of the occurrence or at the lineup "had a beard, mustache, goatee or was clean-shaven." Defendant's authorities on this point include People v. Marshall, 74 Ill App2d 483, 221 NE2d 133 (1966), in which defendant's conviction was reversed because the victim was not sure whether the robber had a mustache at the time of the robbery, and said (p 485):

> "The fact that the defendant did not have a mustache at the trial is not important; but the fact that the witness was not sure whether he had one at the time of the robbery is very important," and normally would not have been overlooked.

Defendant also states that Mrs. Fields testified that she recognized the defendant in the lineup because a green jacket he was wearing was similar to the one worn by the robber. Defendant notes that "Mrs. Fields initially gave her description of the robber to the police and later when she amended her description to include among other things, a black jersey knit shirt, she failed to mention this now very prominent green jacket. She stated she recognized the defendant in the lineup from his green jacket."

Defendant cites People v. Kincy, 72 Ill App2d 419, 219 NE2d 662 (1966), where, in reversing a robbery conviction because the plaintiff identified clothing and not facial characteristics, the court said (p 427):

"Where the conviction of a defendant rests upon identification which is doubtful, vague and uncertain, and which does not produce an abiding conviction of guilt, it will be reversed."

The State maintains that the foregoing authorities are factually distinguishable from the instant case. The state asserts that the record contains nothing vague, doubtful or uncertain about the identification of defendant by Mrs. Fields. The State points out that the original observation was made under favorable conditions for identification—the lighting was excellent (2:00 p. m.), she saw him at close range at the store for about ten to fifteen minutes, and the description given by her to the police was very similar to the lineup description of defendant as given by Officer O'Connell.

We agree that the failure to observe defendant's mustache and the failure to mention initially the green jacket are factors to be used in assessing the credibility of Mrs. Fields, but we do not agree that they are determinative here. The testimony of Mrs. Fields included, "The man that I am talking about I had an opportunity to look at him during this incident. I had a chance to look at him while I was waiting on Mr. Cullors and I saw him during the time when he was fighting with Mr. Cullors. I hardly taken my eyes off of him, maybe once or twice, but I saw him and I saw most of everything that went on. This man saw me face to face while we were in the store."

In sum, we find that the identification evidence was sufficient to support the defendant's conviction beyond a reasonable doubt. The identification by Mrs. Fields of the defendant as the assailant on January 24, 1966, was clear and convincing and unshaken on cross-examination. Precise accuracy in describing facial characteristics is unnecessary where an identification is positive. The testimony of one witness alone, if positive and the witness credible, is sufficient to convict, even though

the testimony is contradicted by the accused. People v. Miller, 30 Ill2d 110, 113, 195 NE2d 694 (1964).

Also, the identification testimony of Mrs. Fields was corroborated by the fingerprint testimony. Mrs. Fields testified she saw the defendant pick up the pasteboard pin box on two occasions while in the store. Officer Lewis found fingerprints on the box and preserved them for identification. It was the professional opinion of the fingerprint expert that the two prints taken from the pin box were identical to the right thumb and index finger of the defendant, and that both sets of prints were made by one and the same person.

Finally, defendant contends that the sentence imposed upon defendant is excessive and should be reduced. Defendant states that the hearing in aggravation and mitigation showed that defendant had only one prior conviction, and that he was 26 years of age. Four psychiatrists, who examined the defendant prior to trial, found him to be mentally retarded. Defendant argues that the imposition of the sentence of 50 to 75 years shows that the trial judge in no way took into consideration the various psychiatric factors, and the minimum sentence "destroys all hope of rehabilitation and eventual release."

The State maintains that the defendant was proved guilty of "a brutal and senseless taking of a human life while in the act of committing a felony," and that his sentence should not be reduced. The State notes that, although the four psychiatrists found him to be "mentally retarded," "a schizoid personality," "slow and retarded," and "garbled and confused," nevertheless it was the opinion of the psychiatrists that the defendant "knew the nature of the charges against him and was able to cooperate with counsel."

■ After considering the nature of the crime and the attending circumstances, including the pretrial findings of the four psychiatrists, we find the sentence was within

■

the statutory limits, and a reduction of the punishment imposed by the trial court is not justified by any reasonable view which might be taken of the instant case. See People v. Hobbs, 56 Ill App2d 93, 205 NE2d 503 (1965).

For the reasons given, the judgments of the Circuit Court of Cook County are affirmed.

Affirmed.

ADESKO, P. J. and BURMAN, J., concur.